## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| DORIS SMITH, | : | Case No. 3:16-cv-164 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| | : | |
| NANCY A. BERRYHILL, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## DECISION AND ENTRY

## I.    <u>Introduction</u>

Plaintiff Doris Smith brings this case challenging the Social Security

Administration's denial of her applications for period of disability, Disability Insurance

Benefits, and Supplemental Security Income.  She applied for benefits on April 4, 2013,

asserting that she could no longer work a substantial paid job.  Administrative Law Judge

(ALJ) George D. McHugh concluded that she was not eligible for benefits because she is

not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the

Commissioner's Memorandum in Opposition (Doc. #10), and the administrative record

(Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ McHugh's non-disability decision.

## II. Background

Plaintiff asserts that she has been under a "disability" since October 1, 2012. She was fifty-one years old at that time and was therefore considered a person "closely approaching advanced age" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). She has a limited education. *See id.* §§ 404.1564(b)(3), 416.964(b)(3). [1]

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ McHugh that she cannot work because her feet swell up and hurt. (Doc. #6, *PageID* #102). As a result, she has trouble walking. *Id.* at 80. Additionally, she is always tired and out of breath. *Id.* Her doctors believe that her feet problems, tiredness, and shortness of breath may be due to a lack of circulation. *Id.* at 102. On the Monday before the hearing she found out that she is supposed to have surgery because her "artery's like 90 percent clogged." *Id.* at 103.

Plaintiff has experienced breathing problems for two to three years. *Id.* at 80. She explained, "if I walk or do anything, I'm just out of breath." *Id.* She has to walk up two steps to go into her house and they bother her if she does this a lot. *Id.* at 83. As a result, "I try to avoid them at all cost[s]." *Id.* She has an inhaler but she does not use it very

---

[1] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

often.  *Id.* at 81.  She uses it about once per month, mostly in the winter.  *Id.* at 82.  Smoke, dust, fumes, and strong smells all bother her.  *Id*.

She smokes less than one pack a day.  *Id*.  She has tried to quit smoking several times.  *Id.* at 106.  She has been hypnotized and tried Chantix but neither helped.  *Id*.  She wants to try the patches if her insurance approves them.  *Id*.

Plaintiff has had back pain for over ten years, but it started getting worse two years before the hearing.  *Id.* at 85.  She described the pain as "like a toothache in my back[.]"  *Id*.  She always has pain in her lower back and sometimes has pain in her upper back.  *Id.* at 85-86.  Sometimes the pain goes down her right leg.  *Id.* at 86.  On a scale from one to ten, her pain is about seven on an average day.  *Id.* at 86-87.  She uses a heating pad and ice on her back to help with the pain.  *Id.* at 89.  When the swelling in her feet goes down, she is supposed to start physical therapy for her back.  *Id*.

Plaintiff has trouble bending at the waist and twisting.  *Id.* at 87.  If she tries to stand and wash dishes, her back pain increases.  *Id*.  She does not vacuum and must have help doing laundry.  *Id*.  She also has difficulty walking.  *Id.* at 88.  When she broke her pelvis, she was prescribed and used a walker.  *Id*.  She had not used it in two years.  *Id*.

Plaintiff has type II diabetes.  *Id.* at 89.  She tests her blood sugar twice a day and uses two different kinds of insulin.  *Id*.  She has diabetic retinopathy and neuropathy in her hands and feet.  *Id.* at 90.  Her hands are constantly numb.  *Id*.  She does not generally have pain in her feet except when she lifts them up, "it feels like needles shooting."  *Id*.  She has these shooting pains every night when she goes to bed.  *Id.* at 106.  She feels nauseous or vomits daily.  *Id.* at 90.  She takes a pill that stops her from vomiting.  *Id*.

Plaintiff has depression that began three or four years before the hearing. *Id.* at 91. She does not want to be around people and cries a lot. *Id.* She spends most of her time sitting in her bedroom. *Id.* Her grandchildren come in and out sometimes. *Id.* at 93. She does not like crowds. *Id.* She only leaves home to go to the grocery store. *Id.* She used to go to church but does not anymore. *Id.* Dr. Menendez prescribes her medication— Elavil. *Id.* at 94. It has calmed her down and made her less anxious. *Id.* at 95. However, it makes her feel tired. *Id.* She saw a therapist for a brief period before she broke her pelvis but did not go back after. *Id.* at 94.

Plaintiff also has difficulty concentrating. *Id.* at 92. She is able to watch a thirty minute television show without too much trouble. *Id.* She has short-term memory problems and sometimes gets confused about making decisions. *Id.* at 99.

Plaintiff lives in a house with her two granddaughters and adult son. *Id.* at 75. She has a driver's license and drives approximately once a week, normally to the store. *Id.* If she drives for too long, it hurts her back and her right hand feels like it is asleep. *Id.* at 75-76. Plaintiff testified that she is able to walk a block before having to stop and rest. *Id.* at 97. She has difficulty lifting and carrying things. *Id.* at 98. She can pick up a gallon of milk but it is hard for her. *Id.* On her right hand, her ring finger and pinky finger are always numb. *Id.* Her left hand also goes numb but it is not as bad as her right hand. *Id.* She also had trouble reaching overhead. *Id.* She can do it but she tries to avoid it. *Id.* at 98-99.

During a typical day, Plaintiff wakes up around 7:30, makes coffee, and watches television shows on her computer in her bedroom. *Id.* at 100. A little later, she usually

makes more coffee and continues to watch TV until she gets hungry.  *Id*.  Then she

makes something to eat, usually in the microwave, and watches cooking shows.  *Id*.

When her granddaughters get home from school, she checks if they are hungry and then

they usually go play with a neighbor until their bedtime.  *Id.* at 101.  She does not go

outside during allergy season.  *Id*.  But, when the weather is nice, she sometimes sits

outside in the shade.  *Id.* at 101-02.

### B.  Medical Opinions

#### i.  Carlos Menendez, M.D.

Dr. Menendez, Plaintiff's treating physician, completed two assessments.  On May

3, 2013, he noted Plaintiff's diagnoses include COPD, type 2 diabetes with peripheral

neuropathy, osteoarthritis of multiple joints, Dupuytren's contracture of right hand,

frozen right shoulder, and anxiety.  *Id.* at 384.  He indicated she has had all of the

conditions for several years.  *Id*.  She requires medications daily; she should continue to

have periodic medical evaluations at his office; and "she would benefit from care from

physical therapy and pulmonologist."  *Id*.  Dr. Menendez opined that Plaintiff has no

limitations with sitting.  *Id.* at 385.  However, she is unable to stand for over twenty

minutes; walk for longer than one block; or lift, push, or pull more than ten pounds.  *Id*.

She is not able to stoop, crawl, or climb ladders.  *Id*.  As a result of her lung disease, she

is not able to tolerate temperature extremes, strong odors, or dusty/smoky environments.

*Id*.  Additionally, she has poor memory and concentration.  *Id*.

On June 13, 2014, Dr. Menendez completed a medical impairment questionnaire.

*Id.* at 898.  He indicated that Plaintiff's symptoms include exertional dyspnea; arthralgias

in her neck, lower back, hands, feet, and ankles; numbness in her hands and feet; and tingling in her hands. *Id.* And, "She has difficulty grasping particularly with dominant right hand." *Id.* He opined that Plaintiff could stand for fifteen minutes at one time, sit for thirty minutes at one time, and work for less than one hour per day. *Id.* She can occasionally lift five pounds and can frequently lift no weight. *Id.* She can occasionally bend, manipulate with her left hand, and raise her left arm over shoulder level. *Id.* at 898-99. She can never stoop, balance, manipulate with her right hand, or raise her right arm over shoulder level. *Id.* He indicated that her pain is severe. *Id.* at 899. She has a significant problem with anxiety and/or depression which would markedly limit her ability to withstand the stresses and pressure of ordinary work activity. *Id.*

### ii.      Michael Lehv, M.D., & Venkatachala Sreenivas, M.D.

Dr. Lehv reviewed Plaintiff's records on June 7, 2013. *Id.* at 134-48. He opined Plaintiff could lift, carry, push, and/or pull twenty pounds occasionally and ten pounds frequently. *Id.* at 142. She could stand and/or walk for six hours in an eight-hour day and sit for six hours. *Id.* She could frequently climb ramps/stairs, crouch, or crawl. *Id.* She can never climb ladders, ropes, or scaffolds. *Id.* She can occasionally reach overhead with her right upper extremity. *Id.* at 143. She should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. *Id.* He concluded that she is not under a disability. *Id.* at 147.

On October 10, 2013, Dr. Sreenivas reviewed Plaintiff's records. *Id.* at 166-80. She confirmed a majority of Dr. Lehv's assessment. However, she limited Plaintiff to occasional pushing or pulling with her right upper extremity due to the limitation of her

shoulder movement. *Id.* at 174. In addition, Plaintiff can frequently stoop and kneel and never crawl. *Id.* She has no limitation in her ability to crouch. *Id.*

## III.    <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc.*

*Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ McHugh to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since October 1, 2012.

Step 2:     She has the severe impairments of chronic obstructive pulmonary disease (COPD); osteoarthritis of the lumbar spine; type II diabetes with peripheral neuropathy; Dupuytren's contracture of the right hand; frozen right shoulder; depression and anxiety; and nicotine abuse.

Step 3:      She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:      Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … subject to the following limitations: (1) lifting and carrying up to 20 pounds occasionally and up to 10 pounds frequently, (2) walking or standing with normal breaks up to 4 hours, (3) sitting up to 6 hours, (4) occasional pushing and pulling with the dominant (right) arm, (5) occasional [use of] foot controls, (6) occasional overhead reaching with the dominant (right) arm, (7) frequent handling and fingering with the dominant (right) hand, (8) no climbing of ropes, scaffolds or ladders, (9) occasional stooping, kneeling and crouching, (10) no crawling, (11) occasional climbing of ramps and stairs, (12) no exposure to hazards such as unprotected heights or dangerous machinery, (13) no concentrated exposure to dust, odors, fumes or pulmonary irritants, (14) limited to simple, routine, and repetitive tasks, but not at a production rate pace or strict quota, (15) limited to a static work environment with few changes in the work setting, (16) a sit/stand option whereby the person can sit for 15minutes out of every hour standing, (17) in addition to normal breaks, off-task less than 5% of the day, and (18) no concentrated exposure to extreme temperatures."

Step 4:      She is unable to perform any of her past relevant work.

Step 5:      She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 44-60).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 60.

## V.    <u>Discussion</u>

Plaintiff contends that the ALJ failed to properly weigh the medical evidence of record.  She also asserts that the ALJ's hypothetical to the vocational expert lacks support in the record.  The Commissioner maintains that substantial evidence supports the ALJ's

evaluation of the medical evidence and the ALJ reasonably relied on the vocational expert's testimony.

## A. Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p,

1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  The goal is to make clear to

any subsequent reviewer the weight given and the reasons for that weight.  *Id.*

Substantial evidence must support the reasons provided by the ALJ.  *Id.*

*Dr. Menendez*

ALJ McHugh found that Dr. Menendez's opinion was not entitled to controlling or

deferential weight and, instead, assigned it "little weight."  (Doc. #6, *PageID* #57).  He

provided several reasons.  He first concluded that Dr. Menendez's "opinion is

unsupported by objective signs and findings in the preponderance of the record."  *Id.*  He

explained, "the lumbar spine pathology in the record is no more than mild to moderate in

severity, and right shoulder imaging was normal.  Pulmonary function studies have

generally shown no more than mild findings, and the claimant's diabetes is not

documented as causing any significant complications."  *Id.*

Plaintiff, however, disagrees.  She asserts that the medical evidence of record

supports Dr. Menendez's opinion.  She emphasized that multiple tests show severe

cardiac and vascular problems as well as multiple orthopedic issues.  (Doc. #7, *PageID*

#s 1038-39).  However, most—if not all—of the issues identified by Plaintiff are

addressed in ALJ McHugh's opinion.  Plaintiff, for example, points to diagnostic imaging

from October 19, 2012 that showed calcified aortic atherosclerotic disease and an EKG

revealed "left anterior fascicular block."  *Id.* at 1038 (citation omitted); *see* Doc. #6,

*PageID* #s 403, 433.  And, on March 17, 2015, a carotid artery report indicated "There is

evidence of right external carotid artery [greater than] 50% stenosis.  Estimated diameter

reduction of the right internal carotid artery is 70-99%." *Id.* (citation omitted); *see* Doc. #6, *PageID* #999.

The ALJ acknowledged Plaintiff's heart condition at step two and reasonably concluded that it was not severe. (Doc. #6, *PageID* #48). He noted that in the carotid artery report, Dr. Peter Podore specified, "this finding is only considered critical with associated symptoms." *Id.* at 999. And, on April 27, 2015, despite noting "a followup carotid ultrasound shows 90% stenosis[,]" Plaintiff's cardiologist, Dr. Khan, does not indicate that Plaintiff has any limitations resulting from the stenosis. *Id.* at 1014. Indeed, Dr. Khan only advised Plaintiff to take aspirin when approved by her ophthalmologist; "discussed management opinions"; and suggested she "may need carotid endarterectomy [and] [s]tenting is an option …." *Id.* Notably, Dr. Menendez does not mention any heart problems in either of his assessments, and thus, does not indicate Plaintiff has any limitations as a result of them.

Plaintiff also explains her orthopedic issues: "Testing shows focal central disc protrusion with annular tear at the L3-4 level with effacement to the ventral surface of the thecal sac, mild facet arthrosis to the mid-and lower lumbar spine, osteoporosis of the lumbar spine and osteopenia of the bilateral hips." (Doc. #7, *PageID* #1038) (citing Doc. #6, *PageID* #s 497, 499-500, 895).

The ALJ addresses these findings as well. He found that Plaintiff's osteoarthritis of the lumbar spine was a severe impairment. (Doc. #6, *PageID* #46). The ALJ, however, also concluded Plaintiff "has not sought the type of treatment one would expect for an individual claiming to suffer from disabling chronic back or shoulder pain." *Id.* at

52. He notes that Plaintiff participated in physical therapy for neck and back pain in 2008 and 2009 and reported good relief. *Id.* at 52, 770-79, 809-20. Additionally, Plaintiff saw a neurologist, Dr. Cynthia Africk, in November 2013. *Id.* at 52, 518-29. Dr. Africk noted that an MRI from September 16, 2013 showed "minimal[] bulges central at L5-S1 and L3-4 [with] no nerve compression." *Id.* at 524. She opined, "Here with right left pain but no nerve pinched on [MRI]. ... No surgery needed on lumbar spine. Will get her into therapy and she can followup with Dr. Menendez." *Id.* at 518. The ALJ correctly observed that Plaintiff has not had significant treatment since that time.

The ALJ further acknowledged Plaintiff's hip pain at step two and reasonably concluded it did not constitute a severe impairment. *Id.* at 47. On August 25, 2013, Plaintiff fell and x-rays showed a fracture of her left inferior pubic ramus. *Id.* at 484, 492. A month later, on September 25, 2013, a bone density densitometry scan of Plaintiff's bilateral hips revealed osteopenia.[2] *Id.* at 497. Plaintiff testified that her doctor prescribed a walker but she stopped using it once her fracture healed. *Id.* at 88. There is no further indication in the record that Plaintiff complained of further problems related to her hips. Accordingly, substantial evidence supports the ALJ's finding that it is not a severe impairment.

---

[2] "[Osteopenia and osteoporosis] are varying degrees of bone loss, as measured by *bone mineral density,* a marker for how strong a bone is and the risk that it might break. If you think of bone mineral density as a slope, normal would be at the top and osteoporosis at the bottom. Osteopenia, which affects about half of Americans over age 50, would fall somewhere in between." *Osteopenia: When you have weak bones, but not osteoporosis,* HARVARD MEDICAL SCHOOL (June 2009; updated Mar. 25, 2017) https://www.health.harvard.edu/womens-health/osteopenia-when-you-have-weak-bones-but-not-osteoporosis.

The ALJ also found that Dr. Menendez's treatment notes were not consistent with his assessments. He acknowledged, "Dr. Menendez's progress notes generally show only some abnormal findings, which have included a slowed gait, moderate para-lumbosacral pain, tenderness over the lumbar spine, decreased and painful range of motion of the right shoulder, right shoulder tenderness, Dupuytren's contracture of the right hand with some notations of 4/5 grip strength in the hands bilaterally, decreased breath sounds, and only some bilateral foot weakness." *Id.* at 57. Plaintiff relies on these, or similar, notes to contend that Dr. Menendez's treatment notes are consistent with his opinion.

But, as the ALJ correctly observed, "these findings were not documented on a consistent basis, and on many other occasions, Dr. Menendez documented no significant muscle spasms, a normal gait, full strength of the right shoulder, clear lungs, normal respiratory rate and pattern, normal breath sounds with no rales, rhonhi, wheezes, or rubs." *Id.* at 57 (citing Exhibits 2F [*PageID* #s 382-433], 6F [*PageID* #s 461-95], 14F [*PageID* #s 535-71], 18F [*PageID* #s 898-905], and 22F [*PageID* #s 960-88]).

Although Plaintiff is able to point to some specific examples of her symptoms, "[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). "[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)). In the present case, substantial evidence supports the ALJ's finding that Dr. Menendez's opinions concerning

Plaintiff's limitations are not supported by objective evidence and are not consistent with his treating notes.

The ALJ also addressed some of the factors. He appropriately recognized that Dr. Menendez has been Plaintiff's primary-care physician for several years. (Doc. #6, *PageID* #57); *see* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). Plaintiff emphasizes that Dr. Menendez's treatment relationship with her was extensive. In June 2014, when he completed one of his assessments, he had seen Plaintiff nine times. (Doc. #7, *PageID* #1039). Further, Plaintiff saw other doctors and nurse practitioners at Dr. Menendez's practice six more times. *Id.* Although this detailed analysis is comprehensive and helpful, the ALJ's failure to include the number of times Plaintiff saw Dr. Menendez does not constitute error in this case.

The ALJ also points out that Dr. Menendez is a family physician and not a specialist. (Doc. #6, *PageID* #57). This observation reasonably supports the ALJ's decision to discount Dr. Menendez's opinions. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.").

ALJ McHugh addresses two of Dr. Menendez's opinions specifically. He first assigns "little weight" to Dr. Menendez's opinion that Plaintiff's depression and anxiety would markedly limit her ability to tolerate work stress. He emphasizes, "Dr. Menendez

is an internist and is less qualified to offer an opinion on the claimant's level of mental functioning." (Doc. #6, *PageID* #57). As mentioned above, specialization is a factor for ALJ's to consider. *See* 20 C.F.R. § 404.1527(c)(5). However, the ALJ should also have acknowledged that Dr. Menendez treated Plaintiff's mental conditions since at least May 2013. (Doc. #6, *PageID* #400).

The ALJ also gave "little weight to Dr. Menendez's opinion that the claimant was 'totally and permanently disabled,' as the determination of disability is a question reserved to the Commissioner, and there is no indication that Dr. Menendez is qualified to offer an opinion on the claimant's employability." *Id.* at 57. The fact that Dr. Menendez expressed an opinion on the ultimate issue of Plaintiff's disability status is not a valid reason to discount or ignore it. "The pertinent regulation says that 'a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.' That's not the same thing as saying that such a statement is improper and therefore to be ignored...." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (internal citation omitted); *see Kalmbach v. Comm'r of Soc. Sec.*, No. 09-2076, 409 F. App'x 852, 861 (6th Cir. 2011) ("the fact that the ultimate determination of disability, *per se,* is reserved to the Commissioner, 20 C.F.R. § 404.1527(e) [§ 416.927(d)(1)], did not supply the ALJ with a legitimate basis to disregard the physicians' [opinions]."). However, the ALJ provided other good reasons for rejecting Dr. Menendez's opinion and, therefore, any errors he made in discussing these two specific opinions are harmless.

The court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standard and whether the ALJ's decision is supported by substantial evidence. *Gayheart,* 710 F.3d at 374. In the present case, ALJ McHugh applied the correct legal standards to determine that Dr. Menendez's opinions are entitled to little weight. The ALJ's decision is supported by substantial evidence.

*State Agency Record-Reviewing Physicians*

The ALJ assigned "significant weight to the opinions of the DDD reviewing physicians [Dr. Lehv and Dr. Sreenivas], with greatest weight to [Dr. Sreeniva's] most recent assessment, as their assessments are generally supported by objective signs and findings in the preponderance of the record." (Doc. #6, *PageID* #56). The ALJ "essentially adopted these limitations but has added a few additional non-exertion limitations to further account for the claimant's severe impairments." *Id.* Plaintiff contends that the ALJ erred in his assessment of these opinions.

Under the Regulations, "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant…." 20 C.F.R. § 416.927(e)(2)(ii); *see* Soc. Sec. R. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996). When considering the opinions of nontreating sources, ALJs use the same factors applicable to weighing treating source opinions—the examining relationship, supportability, consistency, specialization, and other factors such as the source's understanding of disability programs. 20 C.F.R. § 416.927(a)-(d).

Plaintiff contends the ALJ erred by failing to provide citations to evidence that support his conclusion. Plaintiff is correct. However, given the similarities between the ALJ's assessment of Plaintiff's residual functional capacity and the State agency physicians' opinion, the ALJ's reasons for Plaintiff's limitations throughout his decision also support his conclusion that the State agency physicians' opinions are entitled to significant weight. For example, the State agency physicians opined Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently,[3] and she is limited to occasional reaching overhead with her right upper extremity. (Doc. #6, *PageID* #s 142-43, 174-75). The ALJ, after discussing medical reports concerning Plaintiff's shoulder, concluded, "When considering these findings, as well as the relatively mild to moderate pathology described above, the limitation to a reduced range of light exertion with only occasional right-sided overhead reaching adequately accounts for these conditions." *Id.* at 52. Because the ALJ's finding mirrors the State agency physicians' opinions, the reasons he provided for his findings also support the State agency physicians' opinions.

Plaintiff further argues that the ALJ applied much stricter scrutiny to Dr. Menendez's opinion than he did to the State agency physicians. (Doc. #7, *PageID* #1041). She points out, for example, the ALJ noted that Dr. Menendez is a family physician and not a specialist. But, he does not discuss whether the state agency physicians are specialists. The ALJ further discounted Dr. Menendez's opinion because

---

[3] Under the Regulations, "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

"there is no indication that [he] is qualified to offer an opinion of Ms. Smith's employability." (Doc. #6, *PageID* #57). The ALJ does not, however, question whether the state agency physicians are qualified to offer an opinion on Ms. Smith's employability.

Plaintiff is correct that to the extent possible, the ALJ should have indicated whether the State agency physicians specialize in a particular area of medicine. "[T]he regulations do not allow the application of greater scrutiny to a treating-source opinion as a means to justify giving such an opinion little weight. Indeed, they call for just the opposite." *Gayheart*, 710 F.3d at 374. However, the ALJ did not need to address whether the State agency physicians were qualified to offer an opinion of Plaintiff's employability, as "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." Soc. Sec. R. 96-6p, 1996 WL 374180, at *2.

ALJ McHugh did not categorically accept the State agency physicians' opinions. Indeed, he added a significant number of additional limitations. For example, they found Plaintiff could stand and/or walk for up to six hours total in an eight-hour day, and the ALJ lowered it to only four hours. (Doc. #6, *PageID* #s 50, 142, 174). Both physicians opined Plaintiff could frequently climb ramps or stairs and the ALJ reduced it to occasional. *Id.* at 50, 142, 175. Both found she had no limitations in her ability to balance and the ALJ concluded she could never balance. *Id.*

ALJ McHugh provided good reasons for assigning the State agency physicians' opinion significant weight. Substantial evidence supports those reasons.

**B.     Vocational Expert**

Plaintiff asserts that the ALJ's hypothetical to the vocational expert, Charlotte

Ewers, lacks support in the record.  She contends, "The record supports that Ms. Smith

would be off task greater than 10% of the workday. … It seems as if the ALJ also took

that same position, but when it resulted in there being no jobs available, he reduced the

time off task to 5% or less per day."  (Doc. #7, *PageID* #1042).  She further explained,

"This reduction in the percentage of time off task may or may not be a little sketchy.

Unfortunately, the ALJ did not address this in his decision.  It seems a little suspect to

ask a question that would rule out all jobs and then quickly, with no other explanation,

change the question to result in jobs still being available."  *Id.* at 1043.

Plaintiff's summary is not an accurate assessment of the ALJ's conversation with

the vocational expert.  After going through his hypothetical with Ms. Ewers, the ALJ

added two limitations:  1) "A sit stand option whereby the person can sit for 15 minutes

out of every hour standing"; and 2) "In addition to normal breaks, off task less than 10%

of the day."  (Doc. #6, *PageID* #113).  Ms. Ewers responded that the same jobs would

exist with the sit/stand option.  However, she asked the ALJ to clarify how much time the

hypothetical individual would be off task.  She required clarification because the same

jobs would exist if the individual was off task up to 5% of the day, but all jobs would be

eliminated if the individual was off task more than 5% of the day.  Thus, Ms. Ewers

could not answer the ALJ's hypothetical without knowing whether the individual would

be off task 5% or less or over 5%.  As a result, it was not "sketchy" for the ALJ to clarify

his hypothetical to Ms. Ewers.

Accordingly, for the above reasons, Plaintiff's Statement of Errors lacks merit.

**IT IS THEREFORE ORDERED THAT**:

1.     The ALJ's non-disability decision is affirmed; and

2.     The case is terminated on the Court's docket.

Date: September 15, 2017                          *s/Sharon L. Ovington*
                                                 Sharon L. Ovington
                                                 United States Magistrate Judge